**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **FINDABILITY SCIENCES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 20-cv-12236-DJC** |
| | ) | |
| **SOFT10, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM AND ORDER**</u>

**CASPER, J.**                                                    **March 15, 2023**

## I.     Introduction

Plaintiff Findability Sciences, Inc. ("Findability Sciences") has filed this lawsuit against Defendant Soft10, Inc. ("Soft10") seeking declaratory judgment as to non-infringement of copyright (Count I) and non-breach of a software licensing agreement (Count II) and alleging breach of contract (Count III), breach of the implied covenant of good faith and fair dealing (Count IV) and violation of Mass. Gen. L. c. 93A (Count V).  D. 38.  Soft10 seeks declaratory judgment as to breach of contract and misappropriation of trade secrets and intellectual property (Counterclaim Count VII) and has asserted counterclaims against Findability Sciences for breach of contract (Counterclaim Count I), promissory estoppel (Counterclaim Count II), violation of Mass. Gen. L. c. 93A (Counterclaim Count III), misappropriation of trade secrets and intellectual property (Counterclaim Count IV), breach of the implied covenant of good faith and fair dealing (Counterclaim Count V), unjust enrichment (Counterclaim Count VI), recission (Counterclaim Count VIII), conversion (Counterclaim Count IX) and copyright infringement (Counterclaim Count X).  D. 39.  Findability Sciences now moves for summary judgment as to its declaratory

1

judgment claims, Counts I and II, and all of Soft10's counterclaims (Counterclaims I through X). D. 60. The Court ALLOWS the motion as to Soft10's counterclaims for promissory estoppel, unjust enrichment, recission and conversion (Counterclaim Counts II, VI, VIII and IX), but otherwise DENIES the motion.

## II.      Standard of Review

A court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (citation omitted). The movant "bears the burden of demonstrating the absence of a genuine issue of material fact." Rosciti v. Ins. Co. of Pa., 659 F.3d 92, 96 (1st Cir. 2011) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). If the movant meets its burden, the nonmovant "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

## III.     Factual Background

The following facts are undisputed unless otherwise noted and are drawn from Findability Sciences' statement of material facts, D. 62, Soft10's statement of material facts, D. 72, Findability Sciences' response to Soft10's statement of material facts, D. 77, and accompanying documents.[1]

---

[1] Although Findability Sciences correctly points out that Soft10's selective response to its statement of undisputed facts does not comply with Local Rule 56.1 (providing that a "party

Findability Sciences is an enterprise artificial intelligence ("AI") company that combines machine learning, computer vision and natural language processing technologies to develop and implement AI solutions for businesses.  D. 62 ¶¶ 1–2.  Findability Sciences' software platform includes the FP-Predict+ module, which provides prediction capabilities.  D. 62 ¶ 4.  Soft10 is a software company that developed Dr. Mo, an automatic statistical analysis and predictive analytics software product.  D. 64-1 at 2.

On December 28, 2015, Findability Sciences and Soft10 entered into an Alliance Agreement ("the Alliance Agreement").  D. 62 ¶ 23; see D. 64-1.  Under the Alliance Agreement, the parties agreed to "promote & deliver each other's products, solutions and software consulting services to various business organizations."  D. 64-1 at 2.  The parties also agreed to share fifty percent of the net revenue generated by the other party's software services if sold together or by the other party.  Id. at 3.

On July 27, 2017, Findability Sciences and Soft10 amended and restated the Alliance Agreement ("the Amended Alliance Agreement"), D. 62 ¶ 27; see D. 64-2, and entered into a

---

opposing the [summary judgment] motion shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation"), its own summary judgment papers were not a model of clarity in one respect.  Despite having moved for summary judgment as to the entirety of Counts I and II and Counterclaim Counts I through X, D. 60, Findability Sciences' reply brief then took the position that there were at least disputed issues of material facts as to three of the bases for those claims (namely, those relating to Ajinomoto Health & Nutrition North America Inc. ("Ajinomoto"), SoftBank Telecom America Corp. ("Softbank") and Findability Sciences, k.k. ("FSKK"), D. 78 at 4).  Moreover, the disputed issues of fact that Soft10 did raise as to Ajinomoto, D. 72 at 5–7, are sufficient to raise a disputed issue of fact.  Nonetheless since Soft10 does not respond to all material facts of record set forth in Findability Sciences' statement of facts, D. 62, the Court deems admitted all material facts set forth in Findability Sciences' motion which Soft10 has not controverted.  See Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (quoting D. Mass. L. R. 56.1).  As Findability Sciences points out, Soft10 accordingly has only raised disputed issues of material facts as to Ajinomoto, SoftBank and FSKK, D. 78 at 2–4, as discussed at further length below.

Corporate Partnering Software Development License Agreement ("the License Agreement").  D. 62 ¶ 29; see D. 64-3.  Under the Amended Alliance Agreement, Findability Sciences agreed "to actively promote, recommend & sell Soft10's software solutions either integrated with [Findability Sciences'] solutions or on a stand-alone basis" and Soft10 agreed to grant to Findability Sciences "a nonexclusive, nonsublicensable, nontransferable, license to use and access [Dr. Mo]."  D. 64-2 at 2.  Under the License Agreement, Findability Sciences agreed, except as expressly allowed, not to "use, copy, distribute or sublicense [Dr. Mo]."  D. 64-3 at 5.

On August 20, 2018, Findability Sciences and Soft10 entered into an Application Specific License Software Agreement ("the ASL Software Agreement"), which superseded the Amended Alliance Agreement and the License Agreement.  D. 62 ¶ 36; see D. 64-7.  Under the ASL Software Agreement, Soft10 granted Findability Sciences and its affiliates "one perpetual, irrevocable, worldwide, non-exclusive, non-transferable, and royalty-free license to [Dr. Mo] to reproduce, use, modify and prepare the Findability Platform for the purposes of using [Dr. Mo] to develop integration or interfaces between [Dr. Mo] and the [Findability Platform] . . ."  D. 64 ¶ 32; D. 64-7 at 6–7.  Further, Soft10 agreed "to license [Dr. Mo] to [Findability Sciences] for $4,000 per server license per month for ongoing projects."  D. 64 ¶ 33; D. 64-7 at 10.

Findability Sciences had access to Dr. Mo and the capability of generating license keys for such software without the involvement of Soft10.  D. 72 ¶ 1; D. 77 ¶ 1.  Dr. Mo was implemented and utilized as part of Findability Sciences' project with Ajinomoto.[2]  D. 72 ¶ 2; D. 77 ¶ 2.  Between

---

[2] Anand Mahurkar's deposition testimony on this point, the basis for this fact, is open to different interpretations as to how exactly Dr. Mo was implemented in relation to Findability Sciences' project with Ajinomoto.  See D. 71-1 at 13.  Soft10 claims that Dr. Mo was "implemented as a component of the Findability Platform."  D. 72 ¶ 2.  Findability Sciences claims that "components of the Findability Platform were implemented along with Dr. Mo [separately] on Ajinomoto premises."  D. 77 ¶ 2.

November 2018 and May 2019, Findability Sciences paid Soft10 the required license fee for Dr. Mo.  D. 72 ¶ 5; D. 77 ¶ 5.  In June 2019, Findability Sciences stopped paying Soft10 license fees for Dr. Mo.  D. 72 ¶ 6; D. 77 ¶ 6.  Findability Sciences continued to charge Ajinomoto the same monthly amount for the FP-Predict+ license between June 2019 and August 2020 as it did between November 2018 and May 2019.  D. 72 ¶¶ 3, 7; D. 77 ¶¶ 3, 7; see D. 71-5.

FP-Predict+ is a separate program from Dr. Mo that Findability Sciences created using internally developed algorithms, open-source code and third-party APIs.  D. 62 ¶¶ 8, 15.  FP-Predict+ employs three distinct kinds of prediction or forecasting methodologies: (1) classification, (2) prediction for continuous target variables and (3) time series forecasting.  D. 62 ¶¶ 5–6.  Of these methodologies, FP-Predict+ used Dr. Mo only for classification problems.  See D. 62 ¶¶ 9–10.  Prior to developing its own AI software, Findability Sciences' business model was to offer Dr. Mo along with the Findability Platform as part of its AI option.  See D. 71-2 at 9.  When Dr. Mo was being used for one of its customers, Findability Sciences would utilize an instance of Dr. Mo that had been licensed for that specific customer.  D. 62 ¶ 11.  By contrast, FP-Predict+'s prediction for continuous target variables functionality, available as early as June 2019, and its time series forecasting functionality, available as early as February 2020, both use programming language and algorithms that are different from Dr. Mo.  See D. 62 ¶¶ 13–22; D. 65 ¶¶ 16, 18, 102–105.

## IV.   Procedural History

Findability Sciences commenced this action on December 17, 2020, D. 1, and later filed an amended complaint, D. 38.  Findability Sciences now moves for summary judgment as to its declaratory judgment claims, Counts I and II, and all of Soft10's counterclaims, Counterclaim

Counts I through X.  D. 60.  The Court heard the parties on the pending motion and took this matter

under advisement.  D. 82.

## V.    Discussion

### A.    Findability Sciences' Claim for Declaratory Judgment of No Copyright Infringement (Count I) and Soft10's Counterclaim of Copyright Infringement (Counterclaim Count X)

Soft10 alleges that portions of FP Predict+ are copied from the Dr. Mo software and that

Findability Sciences has reproduced, copied and/or distributed Dr. Mo to third parties without the

valid legal authority to do so.  D. 39 at 45.  Findability Sciences argues that Soft10 has no evidence

that it copied or distributed Dr. Mo without Soft10's authorization.  See D. 61 at 16–17.

To establish copyright infringement, a plaintiff must "prove two elements:  (1) ownership

of a valid copyright, and (2) copying of constituent elements of the work that are original."  Soc'y

of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 39 (1st Cir. 2012) (internal

citation and quotation marks omitted).  "To establish actionable copying for the purposes of

copyright infringement, the plaintiff must prove both:  (a) that the defendant actually copied the

work as a factual matter, and (b) that the defendant's copying of the copyrighted material was so

extensive that it rendered the infringing and copyrighted works substantially similar."  Airframe

Sys., Inc. v. L-3 Commc'ns Corp., 658 F.3d 100, 105 (1st Cir. 2011) (internal citation and

quotation marks omitted).  "In the absence of direct evidence of copying . . . one of the ways to

indirectly establish that the defendant copied the plaintiff's work is to provide evidence that (1)

the defendant 'enjoyed access to the copyrighted work,' and so had the opportunity to copy the

work, and (2) 'a sufficient degree of similarity exists between the copyrighted work and the

allegedly infringing work to give rise to an inference of actual copying.'"  T-Peg, Inc. v. Vermont

Timber Works, Inc., 459 F.3d 97, 111 (1st Cir. 2006) (quoting Johnson v. Gordon, 409 F.3d 12,

18 (1st Cir. 2005)).  "The similarity inquiry used to indirectly establish copying is referred to as 'probative similarity' and is 'somewhat akin to, but different than, the requirement of substantial similarity' that must be shown to prove copyright infringement." Id.; see Lotus Dev. Corp. v. Borland Int'l, Inc., 49 F.3d 807, 813 (1st Cir. 1995), aff'd, 516 U.S. 233 (1996) (describing "probative similarity" as when "the offending and copyrighted works are so similar that the court may infer that there was factual copying") (citations omitted).

It is undisputed that Soft10 owns a valid copyright for Dr. Mo.  See D. 62 ¶ 3; D. 64-2 at 4; 64-3 at 5; 64-7 at 5.  The only remaining inquiry, therefore, is whether Soft10 has established actionable copying under the Copyright Act.

1. *Whether Soft10 Has Established That Findability Sciences Enjoyed Access to Dr. Mo and Had the Opportunity to Copy the Work*

To establish that Findability Sciences copied Dr. Mo, Soft10 must provide evidence that Findability Sciences "enjoyed access to the copyrighted work, and so had the opportunity to copy the work." See T-Peg, 459 F.3d at 111.  It is undisputed that Findability Sciences had access to Dr. Mo and the capability of generating license keys for such software without the involvement of Soft10.  D. 72 ¶ 1; D. 77 ¶ 1.  It is also undisputed that Dr. Mo was implemented and utilized as part of Findability Sciences' project with at least one entity, Ajinomoto.  D. 72 ¶ 2; D. 77 ¶ 2.  Accordingly, Soft10 has established that Findability Sciences enjoyed access to Dr. Mo and had the opportunity to copy the work.

2. *Whether Soft10 Has Established Probative Similarity*

Circumstantial evidence that a defendant ran a copyrighted software program outside the scope of its license is sufficient to establish probative similarity under the Copyright Act.  See ICONICS, Inc. v. Massaro, 192 F. Supp. 3d 254, 265 (D. Mass. 2016) and cases cited.  Here, Soft10 has established probative similarity because there is a genuine factual dispute as to whether

Findability Sciences ran a copy of the Dr. Mo software outside the scope of its license, namely to certain, enumerated entities, including Ajinomoto.  <u>See</u> D. 71 at 2–11; D. 78 at 3–4.  Since an act of copying sufficient to violate the Copyright Act occurs each time copyrighted software is run, <u>id.</u>, Soft10 has produced sufficient evidence to satisfy the probative similarity inquiry.

Because Soft10 has produced sufficient, if disputed, evidence as to the elements of its copyright infringement claim, the Court denies Findability Sciences' motion as to Count I and Counterclaim Count X.

> **B.** **Findability Sciences' Claim for Declaratory Judgment of No Breach of the ASL Software Agreement (Count II) and Soft10's Counterclaims of Breach of Contract and Declaratory Judgment (Counterclaim Counts I and VII)**

To succeed on its breach of contract claim, Soft10 "must show (1) the existence of a valid contract; (2) that it has performed its obligations under the contract; and (3) a breach of the contract that causes damages."  <u>Lombard Med. Techs., Inc. v. Johannessen</u>, 729 F. Supp. 2d 432, 438 (D. Mass. 2010).  Soft10 alleges that Findability Sciences breached the terms of the Alliance Agreement, D. 64-1, the Amended Alliance Agreement, D. 64-2, the License Agreement, D. 64-3, and the ASL Software Agreement, D. 64-7 (collectively, "the Agreements"), by failing to pay Soft10 its share of revenue sales that featured the Dr. Mo program and by allowing third parties to use Dr. Mo without a valid license.  D. 39 at 38, 42; D. 71 at 11–14.

> *1.* *Whether Findability Sciences Sublicensed Dr. Mo to SoftBank and Ajinomoto*

There is at least a genuine dispute of fact as to whether Findability Sciences breached the Amended Alliance Agreement, D. 64-2 at 2, and the License Agreement, 64-3 at 5, by sublicensing the Findability Platform containing Dr. Mo to its third-party customers SoftBank and Ajinomoto in a September 2017 Statement of Work, <u>see</u> D. 71-2 at 2–3, where Findability Sciences agreed to perform AI-driven prediction services for Ajinomoto.  <u>See</u> D. 71 at 11–14.  There is also evidence

that Findability Sciences breached the ASL Software Agreement, D. 64-7 at 9, by using Dr. Mo in connection with Ajinomoto between June 2019 and August 2020 without paying Soft10 the required license fee.  D. 71 at 6–11.

Under the Amended Alliance Agreement, Soft10 granted Findability Sciences "a nonexclusive, nonsublicensable, nontransferable, license to use and access [Dr. Mo] and related support implementations of [Dr. Mo] for the purposes of complying with [Findability Sciences'] obligations under this Agreement."  D. 64-2 at 2.  The License Agreement further provided that "[e]xcept to the extent expressly allowed in this Agreement, [Findability Sciences] shall not use, copy, distribute or sublicense [Dr. Mo]."  D. 64-3 at 5.  The relevant clauses of the September 2017 Statement of Work between Findability Sciences, SoftBank and Ajinomoto read as follows:

> Subject to the terms and conditions of this SOW, [Findability Sciences] hereby grants to SoftBank under all of [Findability Sciences'] intellectual property rights in and to the Findability Platform®, in the United States, sub-licensable, non-exclusive, non-transferable right to license a right to use the Findability Platform® to AJINA.

> Subject to the terms and conditions of this SOW, SoftBank hereby grants to AJINA under all of [Findability Sciences'] intellectual property rights in and to the Findability Platform®, in the United States, non-sublicensable, non-exclusive, non-transferable license to use the implemented features of Findability Platform® to AJINA.

D. 71-2 at 2.

Findability Sciences both sublicensed its Findability Platform to SoftBank and Ajinomoto and agreed to perform AI-driven prediction services for Ajinomoto.  See id.  The Statement of Work indicates that Findability Sciences' business model was to offer Dr. Mo along with the Findability Platform as part of its AI "option."  D. 71-2 at 9.  There is no evidence that Findability Sciences offered AI services without Dr. Mo until June 2019.  See D. 62 ¶¶ 9, 11, 18, 21.  Since Findability Sciences was prohibited at this time from sublicensing Dr. Mo under both the Amended

Alliance Agreement and the License Agreement, see D. 64-2 at 2; D. 64-3 at 5, there is at least a genuine factual dispute as to whether Findability Sciences' sublicense of its Findability Platform to SoftBank and Ajinomoto was an unauthorized sublicense of Dr. Mo.

Furthermore, under the ASL Software Agreement, Soft10 agreed "to license [Dr. Mo] to [Findability Sciences] for $4,000 per server license per month for ongoing projects."  D. 64 ¶ 33; D. 64-7 at 10.  As discussed above, Findability Sciences had access to Dr. Mo and the capability of generating license keys for such software without the involvement of Soft10.  D. 72 ¶ 1; D. 77 ¶ 1.  Between November 2018 and May 2019, during which time Dr. Mo was integrated with FP-Predict+, Findability Sciences issued monthly invoices to Ajinomoto for $9,900 for an "FP-Predict+ License."  D. 72 ¶ 3; D. 77 ¶ 3.  During this timeframe, Findability Sciences paid the required license fee for Dr. Mo.  D. 72 ¶ 5; D. 77 ¶ 5.  It stopped doing so in June 2019.  D. 72 ¶ 6; D. 77 ¶ 6.  Nevertheless, between June 2019 and August 2020, Findability Sciences continued to issue monthly invoices to Ajinomoto for $9,900 for the FP-Predict+ License despite purportedly disabling Dr. Mo's functionality.  D. 72 ¶ 7; D. 77 ¶ 7.  As Soft10 argues, a reasonable jury could find that Dr. Mo's functionality was not actually removed since it would have been unreasonable for Ajinomoto to have continued paying the same fee for the FP-Predict+ License had it known that Dr. Mo's functionality had actually been removed.  D. 71 at 10.  On such a finding, it follows that Findability Sciences breached the ASL Software Agreement, D. 64-7, by using Dr. Mo in connection with Ajinomoto for over a year without paying Soft10 the required license fee.

### 2.   Whether Findability Sciences Sublicensed Dr. Mo to FSKK

Similarly, there is a genuine dispute of fact as to whether Findability Sciences impermissibly sublicensed Dr. Mo to its jointly owned subsidiary, FSKK.  Findability Sciences entered into a Distribution Agreement with FSKK on October 1, 2017, granting FSKK "on an

exclusive basis in Japan . . . the right to promote, market, sell and distribute [the Findability Platform] and Product Bundles." D. 71-8 at 1. As discussed above, Findability Sciences' business model was to offer Dr. Mo along with the Findability Platform as part of its AI "option" and there is no evidence that Findability Sciences offered AI services without Dr. Mo until June 2019. See D. 71-2 at 9; D. 62 ¶¶ 9, 11, 18, 21. Under the License Agreement in effect at the time, Soft10 had only granted Findability Sciences "and its Affiliates one . . . license to [Dr. Mo] to reproduce, use, modify and otherwise prepare Derivative Works for the purposes of using [Dr. Mo] to develop integration or interfaces between [Dr. Mo] and [the Findability Platform] . . . and to otherwise develop, test and evaluate Combined Products." D. 64-3 at 4. As Soft10 argues, even if FSKK is an "Affiliate" of Findability Sciences, the scope of this license was limited to developing integration or interfaces between Dr. Mo and the Findability Platform or otherwise developing, testing and evaluating the two products. D. 71 at 12–14; see D. 64-3 at 4. The License Agreement did not grant Findability Sciences' "Affiliates" the right to market, advertise, promote or sell Dr. Mo in Japan. Compare D. 64-3 at 4 with D. 71-8 at 1. Soft10 had granted that right only to Findability Sciences and per the terms of the Amended Alliance Agreement, it was "nonsublicensable" and "nontransferable." D. 64-2 at 2. There, therefore, is a genuine factual dispute as to whether Findability Sciences breached the Amended Alliance Agreement and the License Agreement by sublicensing the Findability Platform to FSKK.

Accordingly, Findability Sciences' motion is denied as to Count II and Counterclaim Counts I and VII.

### C.   Soft10's Counterclaim of Breach of the Implied Covenant of Good Faith and Fair Dealing (Counterclaim Count V)

Soft10 also brings a counterclaim for breach of the implied covenant of good faith and fair dealing. D. 39 at 41. "The covenant of good faith and fair dealing is implied in every contract,

including contracts between sophisticated business people.  The implied covenant provides that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract and exists so that the objectives of the contract may be realized."  Weiler v. PortfolioScope, Inc., 469 Mass. 75, 82 (2014) (internal citations and quotation marks omitted) (omissions in original); see, e.g., FabriClear, LLC v. Harvest Direct, LLC, 481 F. Supp. 3d 27, 36 (D. Mass. 2020).  (holding that the developer sufficiently alleged that the licensee took actions with the effect of injuring the developer's rights under their agreement to receive the "fruits of the contract" for stating a claim for breach of the implied covenant of good faith and fair dealing under Massachusetts law.  Id. at 36 (citation omitted).

Here, like in Fabriclear, there is sufficient evidence to support Soft10's breach of the implied covenant of good faith and fair dealing counterclaim.  As discussed above, Soft10 and Findability Sciences, over several years and across multiple contracts, had an arrangement by which Findability Sciences paid Soft10 a fee in exchange for nonsublicensable access to Dr. Mo. D. 64-2 at 2; D. 64-3 at 5; D. 64-7 at 9.  Considering the parties' "manner of performance," Soft10 had "reasonable expectations," Weiler, 469 Mass. at 82, that Findability Sciences would pay for its use of Dr. Mo and that it would not sublicense Dr. Mo without Soft10's authorization.  On this record, a reasonable jury could find that Findability Sciences "injured the right" of Soft10 to receive the "fruits of the contract," see FabriClear, 481 F. Supp. 3d at 36, had it sublicensed Dr. Mo to Ajinomoto, SoftBank and FSKK and used Dr. Mo in connection with its project with Ajinomoto from June 2019 to August 2020 without paying the license fee.  See D. 71-2 at 2; D. 71-8 at 1; D. 72 ¶¶ 1–6; D. 77 ¶¶ 1–6.

Accordingly, Findability Sciences' motion is denied as to Counterclaim Count V.

**D.** **Soft10's Counterclaim for Promissory Estoppel (Counterclaim Count II)**

Soft10 alleges that Findability Sciences represented that it would pay Soft10 a share of the proceeds of its sales that featured the Dr. Mo software, that it reasonably relied on this promise and that it was harmed in this reliance.  D. 39 at 38–39.  Findability Sciences argues that Soft10 has no evidence of Findability Sciences failing to pay for Dr. Mo as required by the parties' agreements.  D. 61 at 17.

To succeed on a claim for promissory estoppel, "the plaintiff must establish that (1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise." Adamson v. Mortg. Elec. Registration Sys., Inc., No. CIV.A. 11-0693-H, 2011 WL 4985490, at *4 (Mass. Super. Oct. 19, 2011) (citing Loranger Constr. Corp. v. E.F. Hauserman Co., 6 Mass. App. Ct. 152, 154, aff'd, 376 Mass. 757 (1978)).  Promissory estoppel is "an equitable doctrine" that "implies a contract in law where there is proof of an unambiguous promise coupled with detrimental reliance by the promise." Malden Police Patrolman's Ass'n v. Malden, 92 Mass. App. Ct. 53, 60 (2017) (citations omitted).  "When an enforceable contract exists, however, a claim for promissory estoppel will not lie."  Id. at 61 (citations omitted).  Given that there was a contract (actually, several that the parties do not dispute were enforceable here) between the parties, this equitable doctrine does not apply and the Court dismisses this counterclaim on this ground.

Accordingly, Findability Sciences' motion is allowed as to Counterclaim Count II.

**E.** **Soft10's Counterclaim Under G.L. c. 93A (Counterclaim Count III)**

Soft10 alleges that Findability Sciences acted unfairly and deceptively, in violation of Mass. Gen. L. c. 93A ("Chapter 93A"), by failing to pay Soft10 revenue for the purpose of

13

extracting more favorable contract terms and to purposefully harm Soft10 for its own benefit, intentionally misappropriating Soft10's intellectual property and trade secrets, forcing Soft10 to pursue litigation in order to enforce its contractual rights and knowingly and willfully misleading Soft10 for its own benefit.  D. 39 at 39.  Findability Sciences argues that Soft10 has no evidence to support this claim.  D. 61 at 17–18.

> It is well settled that a simple, or even intentional, breach [of contract] is insufficient in itself to constitute an unfair or deceptive trade practice under Chapter 93A.  In order to transform a breach of contract into a Chapter 93A claim, the breach must be both knowing and intended to secure unbargained-for benefits to the detriment of the other party. . . .
>
> Massachusetts courts have consistently held that conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes."

Crosby Legacy Co., LLC v. TechnipFMC PLC, No. 18-CV-10814-MLW, 2019 WL 5588993, at *13 (D. Mass. Sept. 13, 2019) (alteration in original) (citing City of Revere v. Bos./Logan Airport Assocs., LLC, 416 F. Supp. 2d 200, 208 (D. Mass. 2005); Mass. Employers Insur. Exchange v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995); Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998)).

In Crosby, the court found that a consultant stated a plausible Chapter 93A claim where a defendant client, upon a merger and while still using licensed and trademarked materials, promised that the new entity would enter into a new agreement while it had no intention of doing so and while also sharing the materials with its merger partner.  Id.; see Wang Lab'ys, Inc. v. Bus. Incentives, Inc., 398 Mass. 854, 856-57 (1986).

Here, analogous facts are alleged.  In reading the record in the light most favorable to Soft10, a reasonable jury could find that Findability Sciences "disregard[ed] . . . known contractual arrangements" regarding Dr. Mo and "intended to secure benefits for" itself by violating those

14

contractual arrangements.  See Crosby, 2019 WL 5588993, at *13.  Like the defendant in Crosby, a jury could find that Findability Sciences intentionally shared licensed and trademarked materials with a third-party with no intention of abiding by its contract with Soft10.  See id.  Similarly, a jury also could find that Findability Sciences stopped making payments on its contract with Soft10, despite continuing to use Dr. Mo, "constitut[ing] a willful act calculated to obtain the benefits of [Soft10's] contract for [Findability Sciences] without cost and in disregard of known contractual arrangements."  See Wang, 398 Mass. at 857.  Such conduct "constitutes an unfair act or practice for c. 93A purposes."  Crosby, 2019 WL 5588993, at *13.

Accordingly, Findability Sciences' motion is denied as to Counterclaim Count III.

### F.  Soft10's Counterclaim of Misappropriation of Trade Secrets and Intellectual Property Under 18 U.S.C. § 1836 (Counterclaim Count IV)

Soft10 asserts a counterclaim of misappropriation of trade secrets under federal law.  D. 39 at 39–41.  Soft10 alleges that Findability Sciences misappropriated Soft10's trade secrets by knowingly possessing, accessing and/or using Soft10's products obtained without authorization or valid license, in violation of the several software licensing agreements between the parties, which continued even after explicit prohibition from Soft10.  Id.  Findability Sciences argues that Soft10 has no evidence to support this claim.  D. 61 at 18–19.

"To prevail on a claim of misappropriation of trade secrets under Massachusetts law, a counter-claimant must establish that 1) the information at issue constitutes a trade secret, 2) the counter-claimant took reasonable measures to secure the confidentiality of the information and 3) the counter-defendant obtained the trade secret through improper means."  Sensitech, Inc. v. LimeStone FZE, 581 F. Supp. 3d 342, 349 (D. Mass. 2022) (citations omitted).  A plaintiff may also bring a claim under the federal  Defend Trade Secrets Act ("the DTSA") for misappropriation of a trade secret "if it is related to a product or service used in or intended to be used in interstate

or foreign commerce." Id. (citing 18 U.S.C. § 1836(b)(1)).  "The standard for misappropriation under the DTSA is substantially similar to that under Massachusetts law." Id. (citing 18 U.S.C. § 1839(5)-(6)); see Dichard v. Morgan, No. 17-CV-00338-AJ, 2017 WL 5634110, at *3 n.4 (D.N.H. Nov. 22, 2017).

Here, Soft10 has produced sufficient evidence to support all three prongs of its misappropriation of trade secrets claim.

### 1.  Whether Dr. Mo Is a Trade Secret

"A trade secret may consist of 'any formula, pattern, device or compilation of information which is used in one's business, and which [provides] an opportunity to obtain an advantage over competitors who do not know or use it.'" TouchPoint Sols., Inc. v. Eastman Kodak Co., 345 F. Supp. 2d 23, 27 (D. Mass. 2004) (quoting Burten v. Milton Bradley Co., 763 F.2d 461, 463 (1st Cir. 1985)).  "A trade secret need not have the novelty that is requisite for a patent, it must only confer a competitive advantage on its possessor." Id. at 29; see, e.g., Data Gen. Corp. v. Grumman Sys. Support Corp., 825 F. Supp. 340, 358–59 (D. Mass. 1993) (ruling that evidence supported jury finding that diagnostic software program was trade secret where software was unique, effective, conferred competitive advantage to its owner and not a matter of public knowledge); Picker Int'l Corp. v. Imaging Equip. Servs., Inc., 931 F. Supp. 18, 35–37 (D. Mass. 1995) (concluding that diagnostic software and related documentation were "classic trade secrets" because they were developed by servicer as a result of investment of years of effort and great expense, were of great competitive value and were protected by confidentiality agreements signed by employees and others authorized to use software).

Here, the record sufficiently supports a finding that Dr. Mo is a trade secret.  It is undisputed that Dr. Mo was copyrighted, protected by confidentiality agreements and required a license key

to be accessed.  See D. 62 ¶ 3; D. 64-1 at 4; D. 64-2 at 4–5; 64-3 at 5–6; 64-7 at 5, 9; D. 72 ¶ 1; D. 77 ¶ 1.  It is also undisputed that Dr. Mo, at minimum, was a forecasting technology capable of solving classification problems.  See D. 62 ¶¶ 9–10; D. 65 ¶¶ 85, 91, 105.  Findability Sciences saw enough value in Dr. Mo such that, at least prior to developing its own AI software, its business model was to license Dr. Mo and offer it along with the Findability Platform as part of its AI offering.  See D. 71-2 at 9.  There is, therefore, evidence that Dr. Mo conferred a competitive advantage upon those who had access to it.  See Pickler, 931 F. Supp. at 35–37.  Accordingly, a reasonable jury could find that Dr. Mo is a trade secret.

### 2. Whether Soft10 Took Reasonable Steps to Preserve the Secrecy of Dr. Mo

Soft10 "must also show that it has taken reasonable measures to protect [Dr. Mo's] secrecy." TouchPoint, 345 F. Supp. 2d at 29 (citation omitted).  "Courts consider several factors in examining that prong, including: 1) the existence or absence of a [Confidential Disclosure Agreement], 2) the nature and extent of precautions taken, 3) the circumstances under which the information was disclosed and 4) the degree to which the information has been placed in the public domain or rendered readily ascertainable." Id. (ruling that software developer met this prong where defendant customer had explicitly agreed that all information concerning system was to be confidential and developer had repeatedly made oral assertions of confidentiality) (citation omitted); Optos, Inc. v. Topcon Med. Sys., Inc., 777 F. Supp. 2d 217, 240 (D. Mass. 2011) (concluding that plaintiff's precautions to protect its customer lists met the reasonableness standard where it had all of its employees sign confidentiality agreements, where it limited internal access to the protected information and where the information was only disclosed pursuant to a breach of contract).

Viewing the record in the light most favorable to Soft10, each of these factors weigh in Soft10's favor. Soft10 and Findability Sciences signed several Agreements containing confidentiality provisions restricting both parties from disclosing each other's proprietary and confidential information without the other's consent. D. 64-1 at 4; D. 64-2 at 5; D. 64-3 at 6; D. 64-7 at 9. There is evidence that the only reason at least three entities had unauthorized access to Dr. Mo is because Findability Sciences breached the confidentiality provisions in these Agreements. See D. 71-2 at 2; D. 71-8 at 1; D. 72 ¶¶ 1–6; D. 77 ¶¶ 1–6. Findability Sciences has not produced any evidence that Soft10 otherwise disclosed the confidential information such that it had "been placed in the public domain or rendered readily ascertainable." See TouchPoint, 345 F. Supp. 2d at 29. Accordingly, there is sufficient evidence for a jury to conclude that Soft10 took reasonable measures to protect the secrecy of Dr. Mo.

   3.   *Whether Findability Sciences Used Improper Means to Obtain and Disclose Dr. Mo*

"As a matter of law, an individual who breaches contractual duties to obtain trade secrets has used improper means." Optos, 777 F. Supp. 2d at 240 (citations omitted). As discussed above, there is sufficient evidence for a reasonable jury to conclude that Findability Sciences breached several Agreements with Soft10 by obtaining and disclosing Dr. Mo to Ajinomoto, FSKK and SoftBank without Soft10's consent. See D. 71 at 11–14; D. 78 at 3–4; D. 72 ¶¶ 1–6; D. 77 ¶¶ 1–6.

Accordingly, Findability Sciences' motion is denied as to Counterclaim Count IV.

**G.    Soft10's Counterclaim of Unjust Enrichment (Counterclaim Count VI)**

Soft10 alleges that Findability Sciences was unjustly enriched when it received assets and benefits from Soft10, without providing equivalent value, arising from its intentionally false and misleading statements to Soft10. D. 39 at 41–42. Findability Sciences argues that it paid Soft10

for the use of Dr. Mo as contractually agreed and that Soft10 has no evidence showing otherwise. D. 61 at 9, 19.

"[T]o recover for unjust enrichment, a plaintiff must prove that (1) [it] conferred a measurable benefit upon the defendant; (2) [it] reasonably expected compensation from the defendant; and (3) the defendant accepted the benefit with the knowledge, actual or chargeable, of the plaintiff's reasonable expectation." Tedeschi-Freij v. Percy L. Grp., P.C., 99 Mass. App. Ct. 772, 780 (2021) (internal citation and quotation marks omitted). Although a plaintiff may "plead alternative and even inconsistent legal theories, such as breach of contract and unjust enrichment, . . . [it] only can recover under one of these theories." Vieira v. First Amer. Title Ins. Co., 668 F. Supp. 2d 282, 295 (D. Mass. 2009). "[T]his case is no longer at the pleading stage" and the parties do not dispute the enforcement of their Agreements and although they dispute whether Findability Sciences has breached those Agreements in any way, they do not appear to dispute that the Agreements govern its use of Dr. Mo. SiOnyx, LLC v. Hamamatsu Photonics K.K., 332 F. Supp. 3d 446, 473 (D. Mass. 2018) (allowing defendant's motion for summary judgment as to unjust enrichment claim where breach of contract claim was proceeding). Accordingly, given that the breach of contract claim (and related breach of the implied covenant of good faith and fair dealing claim) survive to trial, the Court dismisses the alternative claim for unjust enrichment.

Accordingly, Findability Sciences' motion is allowed as to Counterclaim Count VI.

### H.   Soft10's Counterclaim for Recission (Counterclaim Count VIII)

Soft10 brings a counterclaim for rescission, alleging that Findability Sciences made false representations to extract more favorable contract terms, in circumstances where Soft10 executed agreements under duress, thereby amounting to an abrogation of the Agreements between the parties. D. 39 at 43. Soft10 seeks rescission of all such contracts so that Soft10's damages are not

limited to the terms of the contracts but instead reflect the value of Dr. Mo to the customers who used it.  Id.  Findability Sciences argues that Soft10 received the payments to which it was entitled to under the parties' Agreements and that Soft10 has no evidence of fraud or abrogation of any of the parties' Agreements.  D. 61 at 20.

"Rescission is an equitable remedy that is available when a contract has been entered into through fraud, accident, mistake or some type of grossly inequitable conduct which renders the contract *void ab initio*."  In re Formatech, Inc., 496 B.R. 26, 36 (Bankr. D. Mass. 2013) (citing P.L.A.Y., Inc. v. NIKE, Inc., 1 F. Supp. 2d 60, 65 (D. Mass. 1998)) (internal quotation marks omitted).  It has been noted that:

> [t]here is ample authority for refusing rescission where there has been only a breach of contract rather than an utter failure of consideration or a repudiation by the party in breach.  In the absence of fraud, nothing less than conduct that amounts to an abrogation of the contract, or that goes to the essence of it, or takes away its foundation, can be made a ground for rescission of it by the other party.

Worcester Heritage Soc., Inc. v. Trussell, 31 Mass. App. Ct. 343, 345 (1991) (internal citation and quotation marks omitted).

Here, Soft10 has not produced evidence that it entered any of the Agreements due to "fraud, accident, mistake or some type of grossly inequitable conduct" which rendered the Agreements *void ab initio*.  See In re Formatech, Inc., 496 B.R. at 36.  As discussed above, Soft10 has produced sufficient evidence for a jury to conclude that Findability Sciences sublicensed Dr. Mo to three entities without its permission and that it failed to pay for the use of Dr. Mo in connection with Ajinomoto.  See D. 71-2 at 2; D. 71-8 at 1; D. 72 ¶¶ 1–6; D. 77 ¶¶ 1–6.  While these facts create a triable issue as to whether Findability Sciences breached the Agreements, they do not support a jury finding of "an utter failure of consideration or a repudiation" by Findability Sciences.  See Worcester Heritage, 31 Mass. App. Ct. at 346; cf. Abrams v. Bd. of Selectmen of Sudbury, No.

09-P-1226, 2010 WL 1740435, at *2 (Mass. App. Ct. May 3, 2010) (holding that failure of consideration warranted rescission of settlement agreement).  For example, there is no evidence that any of the Agreements lacked consideration.  Soft10 admits that from at least November 2018 to May 2019, "Findability Sciences paid Soft10 the required license fee for Dr. Mo."  D. 72 ¶¶ 3, 5.  Hence, for at least six months, Findability Sciences had access to Dr. Mo and Soft10 received payment in exchange, as bargained for under the Agreements.  See generally D. 64-1; D. 64-2; D. 64-3; D. 64-7.  And unlike Abrams, the clear intent of the Agreements, that Soft10 grant Findability Sciences access to Dr. Mo in exchange for payment, had been achieved for at least several months.  See 2010 WL 1740435 at *2; D. 72 ¶¶ 3, 5; D. 77 ¶¶ 3, 5.

Accordingly, Findability Sciences' motion is allowed as to Counterclaim Count VIII.

## I.      Soft10's Counterclaim of Conversion (Counterclaim Count IX)

Soft10 argues that Findability Sciences wrongfully converted Soft10's Dr. Mo software by using and distributing it in a manner inconsistent with the agreements between the parties.  See D. 39 at 43–44.  Findability Sciences responds that Soft10 has no evidence that it used Dr. Mo in an unauthorized manner.  D. 61 at 20–21.

"The tort of conversion requires an intentional or wrongful exercise of dominion or control over personal property of another by one with no right to immediate possession."  In re Blast Fitness Grp., LLC, 602 B.R. 208, 229 (Bankr. D. Mass. 2019) (quoting Kelley v. LaForce, 288 F.3d 1, 11–12 (1st Cir. 2002)).  The Copyright Act preempts a conversion claim where (1) the subject of the conversion claim constitutes a work protected under the Copyright Act, and (2) the conversion claim provides a right equivalent to those provided by the Copyright Act.  See, e.g., Hassett v. Hasselbeck, 177 F. Supp. 3d 626, 629 (D. Mass. 2016) (holding conversion claim preempted where claim was based on defendant's unauthorized copying of an author's book);

Jalbert v. Grautski, 554 F. Supp. 2d 57, 75 (D. Mass. 2008) (holding conversion claim preempted where conduct at issue consisted of defendant's alleged distribution of copies of graphic print without authorization and without payment to plaintiff); Henry v. Nat'l Geographic Soc'y, 147 F. Supp. 2d 16, 20–21 (D. Mass. 2001) (holding conversion claim preempted where claim was based on defendant's purportedly unauthorized reproduction of plaintiff's photographs).

Here, both elements are met.  There is no dispute that Dr. Mo, as a copyrighted work of Soft10, falls within the "subject matter of copyright."  See ILOG, Inc. v. Bell Logic, LLC, 181 F. Supp. 2d 3, 6 (D. Mass. 2002) (stating that "[s]oftware, in general, is amenable to copyright protection") (citing Lotus Dev. Corp., 49 F.3d at 813 n.5 (1st Cir. 1995)); 17 U.S.C. §§ 101, 102). As to the second element, Soft10's complaint is that Findability Sciences copied Dr. Mo without authorization.  In essence, Soft10 seeks to enforce its own right to reproduce—a right equivalent to one protected by the Copyright Act.  See Hassett, 177 F. Supp. 3d at 629.  Consequently, Soft10's conversion claim is preempted by the Copyright Act.  See id.

Accordingly, Findability Sciences' motion is allowed as to Counterclaim Count IX.

## VI.   Conclusion

For the foregoing reasons, the Court ALLOWS Findability Sciences' motion for summary judgment, D. 60, as to Counterclaim Counts II (promissory estoppel), VI (unjust enrichment), VIII (recission) and IX (conversion) and DENIES the motion as to Counts I and II (declaratory judgment claims) and Counterclaim Counts I (breach of contract), III (violation of Mass. Gen. L. c. 93A), IV (misappropriation of trade secrets and intellectual property), V (breach of the covenant of good faith and fair dealing), VII (declaratory judgment counterclaim) and X (copyright infringement).

**So Ordered.**

/s/ Denise J. Casper
United States District Judge